# United States Court of Appeals
## For the First Circuit

No. 05-2314

UNITED STATES,

Appellee,

v.

ROCCO P. DESIMONE,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. William E. Smith, U.S. District Judge]

Before

Lynch, Circuit Judge,

Campbell, Senior Circuit Judge,

and Lipez, Circuit Judge.

John A. MacFadyen, III, with whom MacFayden, Gescheidt & O'Brien was on brief, for appellant.
Kirby A. Heller, Attorney, Criminal Division, with whom Robert Clark Corrente, United States Attorney, Luis M. Matos, and Dulce Donovan, Assistant U.S. Attorneys, United States Department of Justice, were on brief, for appellee.

June 7, 2007

**CAMPBELL**, <u>**Senior Circuit Judge**</u>.    Defendant-appellant Rocco DeSimone appeals from his conviction after a jury trial for filing a false tax return, in violation of 26 U.S.C. § 7206(1).  He contends that the district court committed prejudicial errors in excluding and admitting evidence at his trial.   We affirm DeSimone's conviction.

## Background and Facts

On August 18, 2004, a federal grand jury returned an indictment charging DeSimone with wire fraud, in violation of 18 U.S.C. § 1343 (counts 1 and 2), and making and subscribing a false tax return, in violation of 26 U.S.C. § 7206(1) (count 3).  At the ensuing trial, the jury acquitted him of wire fraud but found him guilty on the false tax return count.  The latter alleged that the false return "reported long term capital gains in the amount of $1,000,000, on Schedule D, Part II, line item 16, whereas [DeSimone] then and there well knew and believed that he had not earned such long term capital gains but had, instead, earned ordinary income substantially in addition to the amount reported, all in violation of 26 U.S.C. § 7206(1)."

The evidence at trial included the following.  DeSimone was an art broker.  A mutual friend had introduced DeSimone to Janet Salz, an art dealer.  She agreed to let DeSimone sell two of her paintings - "Canal at Zaandam" by Claude Monet and "Les Mouettes" by Henri Matisse.  According to her testimony, she told

DeSimone she wanted to sell the Monet for $3 million and would give DeSimone a ten percent commission. While he was looking for a buyer, DeSimone kept Salz's two paintings at his house. Although Salz could not identify precisely when she handed DeSimone the paintings, she testified to doing so "not long" before the sale and "not more than a year."

DeSimone found a buyer for Salz's two paintings, as well as for a third painting he had been asked to sell by another owner - "Jeune Fille Blonde" by Pierre Auguste Renoir. James Dorcey introduced the buyer, his neighbor Michael Joyce, to DeSimone, and the three men met at DeSimone's house in August 1999 to view the paintings and negotiate a deal. There was evidence DeSimone originally told Joyce that he was selling the Monet for $5.5-6 million and the Renoir for $3.8-3.9 million, but that he could arrange a lower price if Joyce bought all three paintings. Joyce agreed to do so, and DeSimone reduced the asking price of the Monet to $4.65 million and the Renoir to $3 million. Including the Matisse, the package totaled $8.3 million.

According to Salz, DeSimone contacted her and told her that his buyer would pay only $2.7 million for the Monet, and she agreed to sell it at that price. Regarding DeSimone's commission,

Salz testified that DeSimone told her that "he wasn't going to take any money, because he didn't give me enough money."[1]

Joyce first wired a down-payment of $430,000 to the client escrow account maintained by Richard Corley, DeSimone's attorney, and subsequently wired to Corley's same account the second payment of $7,870,000. On DeSimone's instructions, attorney Corley paid Salz $2.7 million for the Monet and $450,000 for the Matisse. Corley also disbursed funds to the owner of the Renoir, to another art broker as a commission for the sale of the Renoir and the Matisse, and to Dorcey. Other checks written from the Joyce deposits in Corley's escrow account included a total of $1,109,000 to DeSimone, a payment of $10,000 to Corley for his fees, and a payment of $658,000 to one Allen Williams to settle a lawsuit that Williams had brought against DeSimone and another man, alleging, inter alia, fraud in connection with an unrelated art transaction. DeSimone signed over one of the checks that Corley had written to him for $35,000 to Donald Morin as partial payment towards the settlement of another lawsuit that arose from DeSimone's sale of two Ferrari automobiles to Morin.

---

[1] In defending successfully against the fraud counts, DeSimone contended that the arrangement with Salz was one termed in the art world as "consignment with a net price," allowing the broker to retain whatever sum a buyer paid in excess of the owner's asking price. According to DeSimone's expert, such an arrangement was standard practice. The government argued that the arrangement between Salz and DeSimone was actually a transaction called a "consignment with a commission," whereby the broker receives only an amount which may be a percentage of the sale or a flat fee.

According to IRS agent Robert Ferraro, who testified extensively at trial, DeSimone's net profit was $1,767,000, after deducting certain offsetting expenses but without deducting the $658,000 payment to Williams. Contrary to the defense's suggestion, the agent did not believe the Williams settlement could properly be deducted as a business expense for tax purposes from DeSimone's income. According to Ferraro's testimony, DeSimone's return should have reported a net profit from the sale of the paintings of $1,767,000 and should have resulted in an additional tax payment of $422,832.

DeSimone's accountant for about seventeen years was one Michael Corrado. Corrado prepared DeSimone's tax returns based on records that DeSimone turned over to him. These records included bank statements, check stubs, and "one-write" checkbook sheets, which recorded cash receipts and disbursements. Over the years, Corrado had discussed income classifications with DeSimone, who understood the difference between ordinary income earned from his self-employment, which was to be reported on Schedule C of a federal income tax return, and capital gains, which were to be reported on Schedule D, as well as the classification and implications of short-term versus long-term capital gains.

Some time before October 12, 2000, Corrado and DeSimone discussed the sale of "some paintings," and, according to Corrado, DeSimone told him that he expected to earn "[o]ne million dollars

or better."  The two discussed the need to determine the "holding period for purposes of properly classifying the gain."  Corrado explained to DeSimone that the holding period determined which tax rates applied.

After obtaining two extensions for filing DeSimone's 1999 tax return, Corrado finally received the pertinent information from DeSimone and reviewed the documents.  The one-write checkbook revealed that DeSimone had received a $45,000 down-payment towards a "commission," which Corrado reported on Schedule C as self-employment income.  The same sheet also included an entry of the receipt of a down-payment of $1.1 million.  Because the paperwork was unclear as to how to classify that income, Corrado telephoned DeSimone on October 12, 2000, and asked him about it.  According to Corrado, DeSimone responded that he had sold three paintings from his collection "that he owned," and, in response to Corrado's question, stated that he had owned them for more than one year.  During that same conversation, DeSimone told Corrado that Dorcey was entitled to a $100,000 commission on "this painting," which entitled DeSimone to a deduction on his capital gain.

Corrado then completed DeSimone's tax return.  He reported on Schedule D a $1.1 million long-term capital gain, offset by the $100,000 payment to Dorcey, based on the information that DeSimone had provided, and listed the acquisition date of the assets as August 1, 1998, which he supplied as an "arbitrar[y]"

date on his own. Although Corrado had records for business expenses that were properly listed on Schedule C (showing a net income of $51,509), he had none in connection with the sale of the three paintings, and DeSimone never told him of any (with the exception of the single Dorcey payment). Corrado did not know that DeSimone had personally received a net of more than $1.1 million from the proceeds of the art sale and was unaware that DeSimone had paid $658,000 to Williams from those proceeds to settle an unrelated lawsuit. DeSimone and his wife signed the return on October 14, 2000, and it was filed with the IRS.

The total tax shown and paid was $299,456. After learning that a federal investigation of his tax return was taking place, and that Corrado had testified before a grand jury, DeSimone filed an amended return on April 10, 2003. In this return, he reported $1.1 million on Schedule C as a part of his gross income rather than as a capital gain. The amended return indicated an additional tax due of $125,521, for a total tax owed for the year of $423,618.[2]

_____

[2]The Williams settlement sum was not itemized as a deductible business expense either in the original or the amended tax return filed by DeSimone. DeSimone argues, however, that the settlement would have been a legitimate business expense offsetting the sale of the paintings, the proceeds from which sale he had intended to claim as business income. He further suggests at p. 4 of his appellate brief that the $1 million capital gain in the original return reflected "the net of the profit realized from the art sale less the payments to settle the two lawsuits." He makes this contention notwithstanding his further statement, on p. 8, that "whatever the viability of the settlement payments as business

IRS agents, including Ferraro, first approached Corrado about DeSimone's initial tax return on March 9, 2001, five months after Corrado had prepared it. They discussed the October 2000 telephone conversation in which DeSimone had allegedly told Corrado that he had owned the paintings for more than one year, and the agents served Corrado with a grand jury subpoena. Corrado had "no idea whatsoever" that the agents were looking into Schedule C versus Schedule D income or DeSimone's itemized deductions.

Corrado's first grand jury appearance was in August 2001. He told the grand jury, as he had the agents in March, that DeSimone had advised him that he had owned the three paintings for more than a year. More than a year after that grand jury appearance, Corrado testified that he had entered upon a period of uncertainty, during which he questioned the classification of the profits from the sale of the paintings. Those doubts stemmed from DeSimone's frequent telephone calls to Corrado about Corrado's grand jury testimony and the status of the investigation, and a meeting between Corrado and DeSimone's lawyer, Corley. In preparation for that meeting, Corrado prepared some handwritten notes in which he again reiterated that DeSimone had told him that he "had the paintings for more than one year," but that Corrado never asked DeSimone whether he "owned" the paintings. He

---

expenses, they could not be treated as part of the basis for the sale of art."

concluded in his notes that "Rocco was in no way attempting to misrepresent this transaction, and that the issue that has arisen has arisen from nothing more than a miscommunication."

On March 27, 2003, DeSimone's lawyer faxed an affidavit to Corrado for his signature, in which he would attribute the misclassification of the profit to his own "mistake and error." Corrado changed those words to "this misunderstanding as to ownership of the art," but the attorney never incorporated Corrado's changes. At the same time, DeSimone told Corrado that, based upon their longstanding relationship, he "didn't want to have to take legal action against me," which Corrado interpreted as a threat of a malpractice suit. Corrado then signed the unedited affidavit on April 29, 2003, and DeSimone signed, on the same day, a document releasing Corrado from liability for his role in preparing the 1999 tax return. The signed affidavit still incorporated Corrado's statement that DeSimone has told him that he "had the artwork for more than one year."

Agent Ferraro reinterviewed Corrado on September 22, 2003, armed with the affidavit and Corrado's grand jury testimony from August 2001. In a "stern" and "raised" voice and "very assertive" manner, Ferraro told Corrado that it was a crime to lie to a grand jury and a federal agent. In response, Corrado claimed that he did not read the affidavit closely, was guilty of no more than a "failure to read," and had signed the affidavit to "make the

whole thing go away." On cross-examination during trial, Corrado conceded that he never asked DeSimone what he had paid for the paintings or when he had purchased them. He admitted that he simply made up the acquisition date which he entered on Schedule D. He did not ask for any documentation. On redirect, Corrado was permitted to describe his prior testimony to the grand jury that DeSimone had told him he had owned the paintings for more than a year.

## Discussion

DeSimone concedes that his initial tax return for 1999, which he signed, should not have categorized the proceeds he received from the sale of the paintings as a long-term capital gain on Schedule D[3] but should have instead reported them on Schedule C as business income. He also concedes, see note 2, supra, that "whatever the viability of the settlement payments as business expenses, they could not be treated as part of the basis for the sale of art." He denies, however, that the mistakes made in his return were willful, contending instead that they stemmed from his innocent misunderstanding and from mistakes attributable to his accountant Corrado, who prepared the return.

---

[3]On Part II of Schedule D of the return under the heading, "Long-Term Capital Gains and Losses--Assets Held More Than One Year," the property was described as "3 PAINTINGS." Under "(b) Date Acquired," was "08/01/98" and "(c) Date Sold" was "09/07/99." The "Sale Price" was listed as "1,100,000" and the "(e) Cost or other basis" was "100,000," for a "(f) Gain (or Loss)" of $1,000,000.

In this appeal, DeSimone argues that the district court committed reversible error by excluding testimony that would have been probative of his lack of willful intent to make a false tax return. Additionally, DeSimone contests the district court's admission of (1) evidence he says wrongfully bolstered Corrado's credibility and (2) a summary chart showing DeSimone's net profit from the sale of the paintings, accompanied by testimony that the Williams lawsuit had alleged fraud. We turn to these contentions.

I. Exclusion of Evidence of Corley's Testimony Concerning DeSimone's Request That He Call Corrado

We first consider whether the district court erred in refusing to admit testimony by attorney Richard Corley regarding DeSimone's request that he call DeSimone's accountant, Corrado, in connection with whether the payment of $658,000 to Williams in settlement of an unrelated lawsuit should be made from Corley's client account or from DeSimone's personal account. This request occurred, Corley said, just before he remitted to Williams the $658,000 settlement check from the art sale proceeds held in the client's escrow account.

Attorney Corley was called initially as a prosecution witness. During cross-examination, DeSimone's counsel asked him about such a conversation. The government objected that Corley's response would be hearsay. The court overruled the objection and permitted DeSimone's counsel to elicit from Corley that he "had a consultation with [my client]. He asked me to call his attorney

-11-

[sic] concerning the tax ramifications" of the Williams settlement. Defense counsel then sought unsuccessfully to inquire if the heart of the conversation between Corley and DeSimone had gone to whether Corley could write the Williams check directly from Corley's client's account or whether it needed to be written from DeSimone's checking account. The government persisted in its hearsay objection, and after counsel failed to rephrase the question in a manner satisfactory to the court, the court called for a sidebar conference.

Counsel for DeSimone asserted at the sidebar that Corley would testify that, as the sale of the paintings was winding up, DeSimone asked Corley whether he thought the settlement was a business-related expense and whether he could pay Williams directly from Corley's account "because the money was there and Mr. Corley was writing checks, or whether the money needed to go into . . . his personal checking account so that he could pay it from there." Defense counsel represented "[t]he allegation . . . by the government . . . is incredibly important . . . that this was used to pay a personal debt, and it was paid out of here so that there would be no record of it and no one would ever see it. And . . . Corrado told Mr. Corley, this was in consultation with my client, which I'll never get into, that it was a wash." Counsel continued: "This was money he [DeSimone] had earned as a result of his business enterprises, and this was money

-12-

that he was paying to settle a dispute in connection with his business affairs and, therefore, the words used was 'a wash.'"

The government objected that the conversation was hearsay, submitting that it did not qualify as party opponent hearsay under Fed. R. Evid. 801(d)(2). Defense counsel responded, "I am asking him not for the truth." When the district court challenged this rationale, defense counsel argued instead that the testimony could go to the <u>receiver</u>'s state of mind. ("There could be things, Judge, that would be relevant but go to the receiver of the statement's state of mind as to why he did certain things.") The district court sustained the government's hearsay objection "for now" and granted its motion to strike. The court offered to reconsider its ruling if DeSimone's counsel could come back to the matter "at a break" and show the court "why I'm wrong on that." DeSimone's counsel never did so.

A week later, Corley again took the stand, this time as a witness for the defense. The defense again sought unsuccessfully to introduce his testimony about the phone call to Corrado. The government once more objected. By then, the accountant, Corrado, had testified, "I don't recall ever speaking to Attorney Corley" in response to questions that included specific reference to the occasion of the Williams settlement. The government took vigorous exception to an anticipated defense argument that Corley's testimony about Corrado should be admitted as a prior inconsistent

-13-

statement, i.e., inconsistent with Corrado's testimony that he didn't recall speaking to Corley about the Williams settlement. The court ruled that Corley's testimony was not inconsistent with that of Corrado, because the accountant did not deny that the conversation took place but simply did not recall it.

a. Admissibility of DeSimone's Request That Corley Call Corrado

We first consider whether the court erred in refusing to admit Corley's testimony regarding DeSimone's request to call Corrado. We reserve until later our consideration of the admissibility of Corley's evidence of Corrado's alleged response during the call.

The government concedes that evidence of DeSimone's request to Corley to make a call to Corrado in order to determine whether payment of the Williams settlement could be made from the escrow account would have been admissible as nonhearsay circumstantial evidence of DeSimone's state of mind at the time, see, e.g., United States v. Murphy, 193 F.3d 1, 5-6 (1st Cir. 1999) (instructions were not hearsay but offered simply to show that they were given), or else under the hearsay exception for DeSimone's then-existing state of mind, Fed. R. Evid. 803(3).[4] But the

_____

[4]It is unclear from the record whether Corley's initial testimony that he was asked by DeSimone to make the call was stricken by the judge. Initially, the court overruled the government's objection to a question leading to Corley's following answer: "I had a consultation with my client. He asked me to call his attorney concerning the tax ramifications of this particular

-14-

government points out that DeSimone never told the district judge at any time during the trial that those were grounds for admitting Corley's testimony.  This was so even though the court invited the defense to revisit the matter and show it why its exclusionary ruling was wrong, and even though, after the first exclusionary ruling, the defense had a week to research possible legal bases for admitting the evidence before that issue was again discussed during Corley's renewed testimony.  Because the trial court was never advised of the above viable grounds for admission, the government contends we may review the court's exclusionary ruling for at most plain error.[5]  We agree.

At trial, DeSimone's counsel initially provided the judge with no specific basis for overruling the government's hearsay objection.  Thereafter, defense counsel said the proffer went to

---

negotiated settlement."  Subsequently, after further questions and objections, and the sidebar conference, the court told the jury: "I'm going to sustain the last objection, and I'm going to entertain your motion to strike the witness's prior answer to the last question, which dealt with a statement of Mr. DeSimone to the witness, Mr. Corley, about calling an accountant, I believe. You're to disregard that testimony . . . ."  If all that was struck was the answer, "to the last question," the prior testimony that DeSimone asked Corley to call Corrado about the ramifications remained before the jury.  For present purposes, however, we shall assume the entire line of inquiry and answers was meant to be excluded.

[5]Compare Johnston v. Zerbst, 304 U.S. 458, 464 (1938) (waiver) with United States v. Olano, 507 U.S. 725, 733 (1993) (forfeiture) (waived issue ordinarily cannot be resurrected on appeal whereas forfeited issue may be reviewed for plain error, see United States v. Rodriguez, 311 F.3d 445, 437 (1st Cir. 2002)).

-15-

the "receiver's" state of mind, and, a week later, argued that it would show specifically Corley's state of mind and that the settlement payment was a valid business deduction. That the evidence would show not Corley's but DeSimone's state of mind is a proposition that seems first to have been advanced after the conclusion of the trial, when the court heard argument on DeSimone's motion for bail pending appeal. The district court correctly noted then that the ground had not been presented at trial.[6]

As the district court was not advised during the trial that Corley's testimony that DeSimone asked him to call Corrado would be admissible on the theories now proposed, we reject the claim of error based on them. See United States v. Piva, 870 F.2d 753, 759-60 (1st Cir. 1989) (defense counsel's failure "to tell the trial judge why an apparently on-point exception to the hearsay rule arguably did not apply" precluded defendant from raising the argument on appeal); 1 Broun et al., McCormick on Evidence § 51 (6th ed. 2006). Without timely knowledge of the relevant

---

[6]To be sure, as DeSimone notes, the district court did ask counsel at DeSimone's post-conviction bail hearing whether it was possible to infer that the true "receiver" of the conversation was DeSimone, not Corley. The court thus played devil's advocate after the trial by inquiring about this potential inference. But the fact remains that at no time during the course of the trial did the defendant state that the proper ground for admission was DeSimone's own state of mind, nor did the court itself mention such a theory, nor was evidence presented that Corley ever transmitted Corrado's telephone remarks to DeSimone. Insofar as state of mind was alluded to, it was Corley's that was mentioned.

evidentiary purpose, the trial court cannot be held accountable on appeal for not applying the unreferenced grounds.  Cf. United States v. Whiting, 28 F.3d 1296, 1302 (1st Cir.) ("[E]xplaining the purpose for which disputed evidence is offered is normally required to preserve the issue on appeal . . . .  A general reference to 'fighting fire with fire' is hardly much help to a district judge trying to make on-the-spot rulings in the middle of a hectic trial.") (citation omitted), cert. denied, 513 U.S. 956 (1994).

The failure of counsel to have informed the trial court of the correct evidentiary theory under which evidence is sought to be admitted is ordinarily a waiver of the right to argue that theory on appeal.  1 McCormick on Evidence § 51.  In exceptional circumstances, such a failure might conceivably amount to a forfeiture rather than a waiver, reviewable on appeal for plain error.  See Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 103.42 (2d ed. 1997).  But here the exclusion of Corley's testimony did not rise to the level of a "plain error," i.e., what may be described as a "blockbuster" exclusionary ruling that was not only wrong but went to the fairness, integrity and public reputation of the trial.  United States v. Ortiz-Torres, 449 F.3d 61, 75 (1st Cir. 2006); United States v. Griffin, 818 F.2d 97, 100 (1st Cir.), cert. denied, 494 U.S. 844 (1987).  While DeSimone's request that Corley speak to Corrado on the matter presented, had it been admitted, might have provided a further

talking point for the defense, it was not a matter of such fundamental importance.

DeSimone overstates the purport of his counsel's proffer and the persuasiveness of the argument he says he would have made based thereon. The proffer said nothing about whether and what Corrado was told of the source of the sums on deposit in Corley's client account. While counsel initially said DeSimone wished him to ask Corrado about the tax ramifications of the Williams settlement, the heart of the inquiry, as it was portrayed, was not taxes per se but whether Corley could write the Williams settlement check directly from Corley's client's account, as would be most convenient because the money was there and Corley was writing checks, or whether the Williams check needed to be written from DeSimone's personal checking account. DeSimone would have the jury infer from this that Corley was investigating whether the art sale proceeds were themselves business income,[7] that he was obtaining tax advice relevant to that question, and that this would help convince the jury that DeSimone had acted in good faith more than a year later when he signed the erroneous tax return mischaracterizing the sale of the paintings as a capital gain. But

---

[7]That the Williams check itself was a business-related expense was an available argument on the record as it now stands, quite apart from the purported Corley-Corrado conversation. Corley testified the check settled a business dispute with Williams and that it was written after he consulted Corrado about its tax implications. Ferraro testified Corley wrote the check at DeSimone's direction.

this argument, assuming arguendo it were supported by the thin evidence in the proffer, seems as likely to imply bad faith as it does good faith: the more DeSimone had personally looked into the tax situation and learned the 1999 art transactions involved only business income, the less credible his claim of innocent mistake when he later signed the tax return showing a capital gain.

The excluded evidence lacked fundamental probative value for other reasons. The alleged conversation between DeSimone and Corley took place in August or September of 1999, and DeSimone made the alleged misrepresentation to Corrado about holding the paintings for more than a year and signed the fraudulent return more than a year later in October 2000. Any link between DeSimone's state of mind at the time he asked Corley to make the call to Corrado and the time he committed the alleged crime was tenuous. Cf. United States v. Cianci, 378 F.3d 71, 106 (1st Cir. 2004) ("To be admissible under this exception [Fed. R. Evid. 803(3)], a declaration, among other things, must 'mirror a state of mind, which, in light of all the circumstances, including proximity in time, is reasonably likely to have been the same condition existing at the material time.'" (quoting United States v. Colasanto, 100 F.3d 203, 212 (1st Cir. 1996)). Even had DeSimone been thinking of reporting the profit as ordinary business income in August or September 1999, further reflection could easily have led him to a different cast of thought a year later as he meditated

-19-

upon the difference between the tax rates for ordinary income and capital gains and the fact that his taxes were coming due. Further, the offers of proof never linked DeSimone's inquiry to his receipt of the monies from Joyce or suggested that his question was somehow premised on the fact that the income was unrelated to the expense.

We do not find plain error in the district court's exclusion of DeSimone's alleged request for Corley to call Corrado.

b.  Corrado's Replies to Corley

DeSimone also contends, separately, that the evidence of Corrado's replies to Corley (in which Corrado supposedly said that the defendant's income and the Williams settlement were a "wash") was admissible (1) to show DeSimone's good faith reliance on his accountant's advice and (2) as a prior inconsistent statement impeaching Corrado's testimony. The first ground, however, depends upon the exceptions for DeSimone's state of mind already discussed, see supra, section a.  That basis was not preserved at the trial because it was never presented to the court.  Nor was omission of the testimony for that purpose plain error, again for reasons already mentioned.

We add that insofar as Corrado's reference to a "wash" was supposed to show DeSimone's good faith (by indicating the seeking and receipt of correct advice from his accountant), the argument suffers from a further weakness.  To be used defensively

in a tax case, the advice of an accountant calls for a showing that the information necessary to the accountant's advice was known to the accountant before rendering the advice. Compare United States v. Bishop, 291 F.3d 1100, 1106-08 (9th Cir. 2002), cert. denied, 537 U.S. 1176 (2003). But here there was no evidence in the proffer or elsewhere in the record that DeSimone or Corley at this time provided Corrado with information about the sources of the client funds, viz. the sale of the paintings and who had owned them, or about the nature and deductibility of the sum paid in settlement of the unrelated Williams lawsuit. Nor was Corrado asked at this time for advice as to how DeSimone's proceeds from the sale of the paintings would be reportable, either as business income, a capital gain or otherwise. We see little strength in the good faith reliance argument as now described.

DeSimone's argument that the evidence was admissible as a prior inconsistent statement to impeach Corrado's testimony likewise fails. Corrado's testimony was that he did not recall whether Corley had called him about the Williams payment. Such testimony was not necessarily inconsistent with Corley's proffered testimony about the conversation. See United States v. Winchenbach, 197 F.3d 548, 558 (1st Cir. 1999) ("Rule 613(b) [of the Federal Rules of Evidence] applies when two statements, one made at trial and one made previously, are irreconcilably at odds"). Although "[s]tatements need not be directly contradictory

in order to be deemed inconsistent within the purview of Rule 613(b)," Udemba v. Nicoli, 237 F.3d 8, 18 (1st Cir. 2001), the decision whether an inconsistency exists "lies within the sound discretion of the district court." Id.[8] The district court did not abuse its discretion here. Corrado never denied that the conversation took place. Rather, he stated that he did not recall it. His asserted inability to recollect it was not implausible given the five-year lapse between the time the conversation allegedly took place and Corrado's trial testimony. His purported lack of recollection also finds some support in Corrado's telephone call to DeSimone in October 2000, more than a year after the Corley conversation, seeking to determine the source of the $1.1 million in income.

DeSimone argues that Corrado's "wash" statement to Corley was inconsistent with Corrado's testimony that DeSimone never told him that he used the proceeds from the art sale to make the Williams settlement payment. But as it was Corley, not DeSimone, who spoke to Corrado, and as it was not indicated that Corley informed Corrado about the source of the escrow account funds, the

_____

[8]The Second Circuit has noted that:

> To be sure there may be circumstances where the witness in good faith asserts that he cannot remember the relevant events. In such circumstances, the trial court may, in its discretion, exclude the prior testimony . . . .

United States v. Insana, 423 F.2d 1165, 1170 (2d Cir. 1970).

proffer did not indicate that DeSimone told Corrado that the proceeds from the art sale were being used to make the Williams settlement. Corrado's purported reference to a "wash" was therefore not inconsistent with DeSimone's not having told Corrado about the use of the art sale proceeds.

DeSimone's additional argument that Corrado's alleged conversation with Corley was inconsistent with the substance of Corrado's testimony that DeSimone told him to treat the proceeds as a capital gain also reads too much into the Corley offer of proof. The proffer, even when interpreted in the light most favorable to DeSimone, said nothing about the source of the business income against which the deduction could be taken and was, therefore, not at variance with Corrado's testimony that DeSimone told him that he sold the paintings from his collection and had owned them for more than a year. DeSimone argues that this interpretation of the proffer is too literal because the only account with sufficient funds was the business account, thus implying that DeSimone must have believed in good faith that the profit from the paintings was business income (and hence signed the return through oversight or for some reason other than willfulness). But the record indicates little more than that DeSimone wanted Corley to write a check to Williams's attorney "because the money was there and Mr. Corley was writing checks."

In the circumstances, we find no breach of discretion in the court's exclusion of Corrado's alleged response to Corley during the Corley-Corrado conversation.

## II.   Admission of Grand Jury Testimony as Prior Consistent Statement

DeSimone contends that the district court erred in admitting Corrado's grand jury testimony given in August 2001 as a prior consistent statement during his testimony at trial. DeSimone insists that the testimony did not meet the foundational requirements of Fed. R. Evid. 801(d)(1)(B) (evidence offered to rebut an express or implied charge of recent fabrication or improper influence or motive). DeSimone argued at trial, inter alia, that Corrado had a motive to lie when he testified before the grand jury in August 2001, as well as later, and that the claim of fabrication was insufficiently "recent" to justify admission of the prior consistent statement. We find no merit in any of these arguments.

A major flaw with DeSimone's argument is that his own counsel, during cross-examination, elicited from Corrado the substance of the very same 2001 grand jury testimony that DeSimone now claims was later improperly admitted as a prior consistent statement.[9] Thus even if the court were to have erred in allowing

---

[9]The fact that Corrado had given this same testimony before the grand jury in 2001 was also emphasized in DeSimone's jury summation, infra. DeSimone highlighted the 2001 testimony because it demonstrated, in DeSimone's view, the basis of the government's

-24-

the evidence as a prior consistent statement, we see no harm. But, in fact, the court's evidentiary ruling was not a breach of its discretion.

To start at the beginning: During cross-examination of Corrado, defense counsel attempted to discredit Corrado's direct testimony that DeSimone had told him during their October 2000 telephone conversation that he had sold three paintings that he had owned for more than a year. To show that Corrado's testimony was false, defense counsel pointed to Corrado's signing on April 29, 2003, of the affidavit in which he took personal responsibility for making a "mistake and error" in preparing the tax return. Defense counsel also elicited from Corrado that in 2001, before the federal grand jury, he had testified along the same lines as he had just done on direct.

Q: You testified under oath before a federal grand jury in 2001; is that correct?

A: Correct.

Q: And at that time, is it accurate to say you testified consistent with the testimony you've given today on direct examination; is that correct?

[Government counsel]: Objection, your Honor. It's overbroad.

Court: Overruled.

A: Correct.

---

hold over Corrado, enabling Agent Ferraro to use effective threats to force Corrado to recant the affidavit he had later executed taking responsibility for the incorrect tax return.

The jury was thus apprised, then and there, by the questioning of the defense, that in 2001 Corrado had testified consistently with the direct testimony they had just heard.  As noted, this was the very testimony DeSimone later objected to as inadmissible under the prior consistent statement rubric.

The court's contested ruling followed vigorous cross-examination of Corrado on the subject of Agent Ferraro's 2003 visit to Corrado's office.  The visit took place several months after April 29, 2003, when Corrado had signed the affidavit taking greater responsibility for the faulty tax return.  Ferraro brought along the affidavit and Corrado's prior grand jury testimony.  DeSimone's attorney elicited testimony that Ferraro warned Corrado that "it was a federal crime to lie to a grand jury," and that "it was a federal crime to lie to a federal agent in the course of his conducting his duties."  Corrado acknowledged that Ferraro was "very assertive," "stern in his voice," and spoke with a raised voice at times.

During the government's redirect examination, Corrado testified, without any objection, that he told Ferraro during a first interview in March 2001 that "the taxpayer informed me that he had owned those paintings and had owned them for greater than one year."  But when the prosecutor subsequently returned to the topic of Corrado's August 2001 grand jury testimony, defense counsel objected to Corrado's being allowed to answer the

prosecutor's question about the substance of the 2001 testimony, claiming that there was no allegation of a recent fabrication ("My understanding, respectfully, Judge, of what a recent fabrication is is when you are alleging that the witness [sic], I mean, recent, as in very recent, we're talking about 2003. This is 2005."). The court observed that defense counsel had "essentially alleged that his [Corrado's] testimony in this trial was a fabrication." Defense counsel countered: "Right. Respectfully, Judge, the recent fabrication as it relates to this type of rehabilitation with a prior consistent statement has a very specific meaning. And the meaning is that I have to be alleging that the witness is changing his testimony at the moment, I mean, as in inconsistent with all of his prior statements."

The government argued in response that the prior testimony rebutted a claim of "recent fabrication," and "improper influence and motive," because defense counsel suggested that Corrado changed his "story back after a visit from Robert Ferraro" in 2003. The district court agreed.

Corrado then testified that he previously had testified before the grand jury in 2001, under oath and under penalty of perjury, that "the paintings were owned by Mr. DeSimone" and that "he owned the paintings and owned them for a period of greater than one year." Defense counsel returned to the topic during re-cross. In response to questioning, Corrado testified that he had

previously testified twice to the grand jury that DeSimone owned the paintings for more than one year, that he told the same facts to a federal agent, and that lying to either is a federal crime.

As we have already indicated, any error in admitting Corrado's 2001 grand jury testimony under Fed. R. Evid. 801(d)(1)(B) would be harmless given that defense counsel had himself earlier brought out the substance of that testimony. But even were that not so, the court's ruling was plainly proper. The district court's decision to admit a prior consistent statement is reviewed for abuse of discretion. United States v. Washington, 434 F.3d 7, 14 (1st Cir. 2006). Whether, in particular, the prior statement rebuts a charge of recent fabrication or improper motive or influence is reviewed for clear error. Piva, 870 F.2d at 758. There was neither abuse of discretion nor clear error here.

A prior consistent statement is not hearsay if it is "consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive." Fed. R. Evid. 801(d)(1)(B). In interpreting the rule, the Supreme Court has held that "the prior consistent statement must have been made before the alleged influence, or motive to fabricate, arose." Tome v. United States, 513 U.S. 150, 158 (1995).

Corrado's grand jury testimony in August, 2001 predated one of the main events defendant asserts constituted an influence

or motive to fabricate, namely, Ferraro's September 2003 interview with Corrado at which he pressured Corrado to retract his affidavit accepting blame for the erroneous tax return. During cross-examination, defense counsel attempted to establish that the version of events recounted in Corrado's affidavit (that the erroneous tax return was the result of Corrado's error) was correct, and that Corrado's different testimony in 2004 before the grand jury and at trial had resulted from Agent Ferraro's "threats" during the September 2003 interview. DeSimone's attorney emphasized the stern warning Ferraro had given to Corrado of the criminal penalties for lying to the grand jury and to federal agents. Corrado said he felt so intimidated during the interview that he offered the rationale that he had not read the affidavit very carefully before signing it and that he was merely guilty of a "failure to read." During summation, defense counsel later discussed at length the issue of Corrado's rejection of the contents of his affidavit. Counsel contended that Ferraro had read Corrado the riot act. He asserted that Corrado's direct testimony at trial was the result of his need to "preserve himself," especially given his earlier statements along the same lines in 2001.

Corrado did not have a comparable motive to lie in August 2001 when he first testified before the grand jury, doing so in a manner consistent with his later grand jury and trial testimony.

-29-

Corrado testified that he was unaware of the nature of the investigation when Ferraro first approached him in the months before his 2001 grand jury appearance. There was no suggestion that at that time Ferraro pressured him to implicate DeSimone or to shape his testimony to a version of events.

DeSimone argues that Corrado acquired a different motive to lie early on. This motive arose, DeSimone says, as soon as Corrado learned the IRS agents were investigating the incorrect return he had prepared, since the mistakes in the return would open him to a malpractice suit. But it was not a clearly erroneous factual finding for the court to conclude that the improper influence particularly emphasized by the defense, i.e., Agent Ferraro's threats made in September 2003, did not exist at the earlier time. Piva, 870 F.2d at 758. The possible existence of an earlier and different motive to lie would not prevent the admission of a prior consistent statement designed to rebut a subsequent different claim of fabrication. Nor do we see anything in the lengths of time between 2001 and 2003 and 2004 that would call the ruling into question.

We conclude, therefore, that the court's ruling of admissibility under Fed. R. Evid. 801(d)(1)(B) was not clearly erroneous. And as earlier noted, the fact defense counsel himself elicited the same information makes the issue largely academic.

III.  Admission of Summary Chart

DeSimone argues that the district court abused its discretion in admitting into evidence a summary chart prepared by Agent Ferraro itemizing DeSimone's receipt of payments and net profits relative to the sale of the paintings.  We find no abuse of discretion.

a.  Background

Agent Ferraro was the main government witness testifying to DeSimone's 1999 tax obligations.  Ferraro began his testimony by describing his own qualifications and expertise, developed during twenty-two years as a special agent with the Criminal Investigation Division of the IRS and eleven years as a revenue officer and revenue agent.  He testified to having investigated DeSimone to determine if his 1999 tax return, especially Schedules C and D, was accurate.  He said he had analyzed relevant documents in the case and had observed the trial.

Ferraro testified to having prepared a worksheet - the chart - to determine DeSimone's total net profit from the sale of the paintings.  Marked as government exhibit 74, the one-page document had twenty-eight line-item entries comprising the total deposits in Corley's client account, expenses, and disbursed net profit.  The prosecutor asked Ferraro whether the worksheet "fairly and accurately summarize[d] your analysis of the transaction regarding the sale of the Monet, the Matisse, and the Renoir," and

Ferraro responded that it did. The district court admitted the document over defense objection, observing that "It's a summary. Everything listed here has been admitted." Defense counsel argued that he was not objecting on the ground that the underlying documents were not in evidence, but that the exhibit was a worksheet and not a summary. He conceded that "[i]f counsel wants to call it something else, then it may be admissible." The court overruled the objection. Defense counsel did not seek any instruction limiting the jury's use of the document.

b. Discussion

We review the admission of an exhibit like the summary chart for abuse of discretion. United States v. Sawyer, 85 F.3d 713, 740 (1st Cir. 1996). "It is hard to imagine an issue on which a trial judge enjoys more discretion than as to whether summary exhibits will be helpful." Fraser v. Major League Soccer, L.L.C., 284 F.3d 47, 67 (1st Cir.), cert. denied, 537 U.S. 885 (2002).

The court here did not identify the particular rule under which it admitted the summary chart. In its pre-trial submission, the government had advocated the chart's admission under Fed. R. Evid. 1006, a rule addressing the summary admission of materials too voluminous to be introduced individually. In its appellate brief, the government argues the chart was properly allowed pursuant to Fed. R. Evid. 611(a), which authorizes the court to "exercise reasonable control over the mode . . . of . . .

presenting the evidence so as to (1) make the . . . presentation effective for the ascertainment of the truth, [and] (2) avoid needless consumption of time." DeSimone contests both grounds for admission. In a letter submitted pursuant to Fed. R. App. P. 28(j), the government now suggests the chart was properly admitted pursuant to Fed. R. Evid. 703, which provides for the admission of materials on which expert testimony relies.

Our court has recently considered the interrelationship of the foregoing three rules in United States v. Milkiewicz, 470 F.3d 390, 395-400 (1st Cir. 2006). Much of what was said there is relevant here and need not be repeated. The rules are not mutually exclusive and often may be read together in a common sense manner. Id. DeSimone insists that the chart did not summarize underlying documents that had been made available to the opposing party and was not accurate and non-prejudicial as required under Rule 1006; that it did not fit within Rule 611(a); and that as Ferraro was not qualified as an expert, the chart could not be introduced under Rule 703. Without necessarily discounting the relevance of Rules 1006 and 611(a), we find Rule 703 dispositive in validating admission of the chart here.

Rule 703 allows a court to provide the jury, in appropriate circumstances, with the "facts or data" underlying an expert's opinion, and such material may be presented in the form of a summary chart. Milkiewicz, 470 F.3d at 398. Contrary to

-33-

DeSimone's contention, Ferraro was qualified to testify as an expert. At the outset of his testimony, Ferraro testified to his special knowledge and long-time experience in the taxation field. In comparable instances, we have said that an "IRS agent is qualified to express an opinion on the tax consequences of a transaction." Id. at 401 (citing United States v. Mikutowicz, 365 F.3d 65, 72 (1st Cir. 2002) (an IRS agent presumably is qualified to testify as an expert regarding the amount of an outstanding tax liability)).

DeSimone has not suggested the district court erred when it found, "[i]t's a summary. Everything listed here has been admitted [in evidence]." When asked by the trial court whether there was any item not admitted, defense counsel responded "No." The chart listed complicated transactions from many sources to summarize the government's calculations concerning taxable income, an essential part of the government's case. The district court did not abuse its discretion in admitting the summary chart as an aid to Ferraro's expert testimony as an IRS agent. The listed information was, as conceded by the defense, data already admitted into evidence, hence no problem arose under the Rule's limitations concerning "otherwise inadmissible" evidence. See also United States v. Marchini, 797 F.2d 759, 765-66 (9th Cir. 1986) (district court did not abuse its discretion in admitting summary chart of IRS agent because agent was qualified as expert, calculations were

based upon evidence adduced at trial, and he was cross-examined), cert. denied, 479 U.S. 1085 (1987).

We, therefore, uphold the district court's allowance of the chart.

IV. Admission of Testimony about the Williams Settlement

We turn now to the district court's allowance of Ferraro's testimony about the details underlying the settled Williams lawsuit, including its claim of fraud. While initially the district court warned it would not allow underlying evidence of what the Williams lawsuit was all about, it qualified its ruling by saying that if DeSimone opened the door, "you can bring it up." Thereafter, after the defense had cross-examined Ferraro, the government argued, and the court agreed, that the defense had opened the door to questions about the details of the Williams lawsuit by its prior questioning implying that the sum DeSimone paid Williams to settle the lawsuit was a deductible business expense. DeSimone now contends, to the contrary, that his prior questioning of Ferraro did not open the door. We hold that the district court's ruling on this matter was well within its discretion.

a. Background

The genesis of this issue extends back to before the trial, when the government told the court and DeSimone it intended to introduce evidence of the transactions that had resulted in

-35-

Williams's and Morin's settled lawsuits against DeSimone. This evidence was said to be material either because it related directly to the charged tax offense or was admissible pursuant to Fed. R. Evid. 404(b). The court responded that "these items come in on the facts of what they are, but I don't want a lot of testimony about the underlying, for example, the underlying conduct of the defendant and as to Mr. Williams and what their dispute was all about." The court qualified that ruling by noting that if DeSimone "opens the door to certain things, then you can bring it up, either on cross-examination or on rebuttal."

At trial, both Williams and Morin testified in person about the settlements as witnesses for the government, but neither described the details of their disputes with DeSimone, nor the specific charges in their complaints.

After Ferraro took the stand, his chart, supra, showed as income to DeSimone, without deduction, amounts later paid out of Corley's client escrow account to settle the two claims against DeSimone - the $658,000 payment to Williams and the payment to Morin. During cross-examination, defense counsel challenged Ferraro's characterization as taxable income of amounts equal to the settlement payments, suggesting they could be deductible expenses:

Q: Is it accurate to say that an individual who runs their own business might have deductible expenses?

A: Yes.

-36-

Q: And is it accurate to say that monies that they have to pay to resolve disputes related to their business expenses could be deductible as a business expense on Schedule C?

A: I think I'd have to know a little bit more about the type of - I would need more information to determine that.

. . . .

Q: And is it accurate to say that there are litigation expenses that can be deductible if the litigation is connected to the business?

A: I believe there are some. I cannot be sure if every type of litigation expense would be deductible.

. . . .

Q: And you'd need to know what the facts were; is that correct?

A: Yes

Defense counsel then questioned Ferraro about the Morin payment specifically, including whether the agent knew "whether or not that lawsuit was business-related," trying to challenge Ferraro's classification of the amount of the check as income rather than as a deductible expense. He then asked Ferraro about the Williams settlement payment:

Q: Let me direct your attention, if I could, to item 21 [on government exhibit 74]. This is income that you attribute to Mr. DeSimone as well; is that correct?

A: That's correct.

Q: That's a $658,000 payment to settle a lawsuit; is that correct? You heard the testimony of Mr. Williams, didn't you?

A: Yes.

-37-

Defense counsel further established that the settlement check was cut from Corley's escrow account.

During the redirect examination, the prosecutor attempted to counter DeSimone's claim that those checks were proper business deductions. Ferraro testified that he considered the Williams settlement a personal expense that could not be deducted from DeSimone's business income. The prosecutor then asked a series of questions concerning Ferraro's analysis of the Williams payment settlement. The court ruled, over DeSimone's objection, that defense counsel had "opened the door to this."

In response to the prosecutor's questions, Ferraro briefly described the facts underlying the Williams lawsuit. Williams, he said, had made a loan to an attorney named Kevin O'Coin, who then gave the funds to DeSimone to buy paintings. Williams's loan was never repaid. Ferraro stated that the lawsuit alleged fraud but that Williams's claim of fraud was merely an allegation. On re-cross, the defense tried to elicit testimony from Ferraro that the Williams settlement was, in fact, a deductible business expense. Ferraro hesitated over whether a settlement in a case alleging fraud could ever be deducted as a business expense, noting that he would need more information in order to determine that question. DeSimone did not request a limiting instruction on the use of the evidence, and none was given. No expert evidence was introduced by the defense, nor was

legal precedent called to the court's attention, to suggest that Ferraro was incorrect that settlement of a case alleging fraud might not be deductible as a business expense, or otherwise supporting the claim of deductibility of the $658,000 Williams settlement. See Redwood Empire Sav. & Loan Assoc. v. Comm'r of Internal Revenue, 628 F.2d 516, 520 (9th Cir. 1980) (legal expenses and settlement costs incurred in defending against a claim of fraud that would injure or destroy a business have been held to be ordinary and necessary business expenses).

b. Discussion

DeSimone argues that opening up the details of the Williams case, especially the fraud claim, was highly prejudicial and unjustified. He contends that the prosecutor mischaracterized certain of the defense's prior questions to Ferraro.[10] DeSimone

_____

[10]DeSimone puts heavy emphasis on the fact that during redirect examination, shortly before the court ruled the defense had "opened the door" to further questioning of Ferraro concerning the nature of the Williams lawsuit, Ferraro mistakenly acknowledged remembering having been asked by defense counsel whether he had "investigated or assessed" whether the $658,000 check to Allen Williams was a "business or personal expense." In fact, while Ferraro had been asked whether monies paid to resolve business-related disputes can be deductible, and whether the Morin settlement was business-related, he was not asked specifically whether the Williams settlement was also business-related; however, the questioning indicated much the same point. According to DeSimone, Ferraro's misstatement of the precise question amounted to a fatal error not only by him but by the trial judge (in not sua sponte intervening). However, DeSimone's counsel never called the court's attention to the discrepancy when it occurred during Ferraro's redirect testimony. As the questions earlier put to Ferraro on cross-examination were very like the one mistakenly attributed, it was hardly plain error for the court not to

denies asking Ferraro any questions concerning whether the Williams settlement was properly deductible or anything about the tax consequences of that payment. He says his counsel asked only whether the Williams settlement was the result of a "lawsuit," a fact already in evidence through Williams himself during the government's case. He says he did not actually ask whether the lawsuit was business-related, nor about the nature of the Williams lawsuit or the content of its allegations.

However, DeSimone's counsel asked Ferraro several times whether monies self-employed individuals had to pay to resolve disputes or litigation relating to their businesses were deductible. After Ferraro demurred as to whether every type of litigation expense would be deductible, counsel asked if he'd "need to know what the facts were, is that correct?" Counsel then questioned Ferraro about the Morin settlement, asking "whether or not that lawsuit was business-related." Finally, he asked whether the $658,000 Williams payment was attributable to DeSimone. After Ferraro acknowledged it was, he was asked if the Williams payment was indeed "to settle a lawsuit." Defense counsel thus sought to establish that - contrary to Ferraro's opinion - the $658,000 Williams settlement payment could be properly have been viewed by DeSimone as a business expense that he could deduct in computing his income tax. The government's questions on re-direct concerning

intervene sua sponte.

the details of the Williams lawsuit could logically be seen by the court to follow from that line of inquiry in order to counter the defendant's attempt to present the Williams settlement as a legitimate business expense. Ferraro in his later testimony expressed doubt as to the deductibility of fraud claims and earlier had made clear his need to know all the facts before passing on deductibility. Having entered the quagmire of the deductibility of the Williams settlement, the defense could not insist that the court leave undisturbed only a selective version of the facts. See United States v. Balthazard, 360 F.3d 309, 317 (1st Cir. 2004) (trial court did not act inappropriately by permitting government to follow up on relevant issue defendant himself had raised).

At a later sidebar, the district court emphasized the relevance of the government's questions, in response to the defense's argument that the issue of the accounting of the settlements was a "collateral" one. The court asked, "Why is it collateral? It goes directly to your defense and to their allegation, that is, they allege these funds were personal income to the defendant. You allege that they are--you defend that they are business expenses of the defendant." The court later said, "This distinction, personal versus business, is part and parcel of your defense. And it's part and parcel of the allegations so it has to be part of your defense. You can't separate the word 'fraud' or the nature of the allegations of these underlying

lawsuits to make it totally antiseptic."  We find the court's assessment of the situation reasonable, so as to fall within its broad discretion.  The testimony was properly allowed.[11]

**Affirmed**.

---

[11]The focus of DeSimone's claim on appeal is on the fact that the court erred in allowing Ferraro to testify when the defendant had not opened the door to the testimony.  To the extent DeSimone also argues on appeal that the admission of Ferraro's testimony about the fraud allegation was error because it was inadmissible hearsay, hence not discloseable pursuant to Fed. R. Evid. 703 (facts or data otherwise inadmissible shall not be disclosed to the jury by proponent of expert testimony), DeSimone waived that issue by failing to raise it during trial.  When defense counsel objected to Ferraro's testimony that the Williams lawsuit involved a fraud allegation, it is apparent from the context of the transcript that he was objecting on the grounds that he did not believe he had "opened the door" to the subject in his cross-examination.  As already discussed, the court and parties had addressed the issue of "opening the door" previously, and the court's response to the defense's objection during Ferraro's redirect, "Overruled.  You opened the door to this.  Go ahead," indicates the court's focus on that issue when ruling on the objection.  Counsel for DeSimone did not then, nor later at the lunch break, when he expanded on the reasons for his objection, invoke hearsay as a ground for his objection.  "If a party makes a general objection when a specific objection is needed and the objection is overruled, the party is precluded from asserting the proper objection on appeal.  The time to have focused attention on the true objection was in the trial court, when there might have been a chance to cure the objection." Weinstein's Federal Evidence, § 103.12[4].