# United States Court of Appeals
## For the First Circuit

Nos. 08-2088, 08-2471

UNITED STATES OF AMERICA,

Appellee,

v.

DANIEL W. McELROY AND AIMEE J. KING McELROY,

Defendants, Appellants.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

Before

Torruella, Ripple,* and Boudin, Circuit Judges.

James L. Sultan, with whom Charles W. Rankin, Kerry A. Haberlin, and Rankin & Sultan were on brief for the appellants.
John-Alex Romano, Attorney, Criminal Division, U.S. Department of Justice, with whom Michael K. Loucks, Acting United States Attorney, and Jonathan F. Mitchell, Assistant United States Attorney, were on brief for the appellee.

November 20, 2009

---

* Of the Seventh Circuit, sitting by designation.

**RIPPLE, <u>Circuit Judge</u>**.  Daniel McElroy and Aimee King McElroy were indicted by a grand jury on one count of conspiring to defraud the United States of employment and income taxes and to commit insurance fraud by use of the mails, in violation of 18 U.S.C. § 371; three counts of mail fraud, in violation of 18 U.S.C. § 1341; and fourteen counts of procuring false tax returns, in violation of 26 U.S.C. § 7206(2).  After trial, a petit jury returned a verdict against them on all counts.  The district court subsequently sentenced Mr. McElroy to 108 months' imprisonment and Ms. McElroy to 78 months' imprisonment.[1]  Both defendants now appeal their respective convictions and sentences.  For the reasons set forth in this opinion, we affirm the judgment of the district court.[2]

## I.  BACKGROUND

From 1993 to 2001, the defendants owned and operated Daily A. King ("DAK"), Pro Temp and Precission, temporary employment agencies that supplied manual laborers to area businesses.  The Government maintains that the defendants were, in fact, operating a single business and defrauded the Government of more than $9.9 million in payroll taxes by paying their temporary

---

[1]  To assist the reader, we shall refer to each defendant by first name when that convention facilitates comprehension.

[2]  The jurisdiction of the district court is based on 18 U.S.C. § 3231.  Our jurisdiction is based on 28 U.S.C. § 1291.

-2-

workers in cash and by failing to report those payments to the Government or to the workers' compensation insurance carriers.

At trial, the Government offered testimony of DAK, Pro Temp and Precission employees showing that the companies operated out of the same office space at 14 Bristol Drive, Easton, Massachusetts. Aimee managed and oversaw the employees who worked in that office. DAK literature stated that Aimee was the President. The former employees testified that DAK, Pro Temp and Precission all employed the same temporary workers. The former employees explained how Aimee maintained a computerized payroll system for some of the temporary workers, who were paid by check, but maintained separate payroll records on floppy disks for other temporary workers, who were paid in cash. One former employee who worked in the Bristol Drive office testified that she assumed that she had been working for one company. A former temporary worker, Lucia Raposo, testified that, despite her request to receive her salary by check, she sometimes received cash.

Marta Rodriguez, a former DAK employee, testified that she occasionally saw Aimee and Daniel distribute cash in the office to cover payroll. Other witnesses explained how Daniel employed them to pick up cash from the office and distribute it to the temporary workers at the client locations. Two clients, owners of local businesses who had utilized DAK, Pro Temp and Precission for their employment needs, testified that Daniel attended meetings and

negotiated service arrangements with them. The clients were aware that the temporary workers were sometimes paid in cash at their locations.

Two auditors from different workers' compensation insurance companies testified about policies the defendants took out for DAK, Pro Temp or Precission and how, at various times, the defendants attended audit meetings concerning the policies. Many of the policy documents were mailed to the defendants. The Government introduced falsified payroll summaries and IRS forms that federal agents recovered when they raided the Bristol Drive office.

IRS Special Agent Joseph Guidoboni testified as a summary witness about the defendants' reporting obligations to the IRS. He testified that, based on his review of the companies' business records, the defendants paid taxes on the payroll they distributed in check form, but paid no taxes on the payroll they distributed in cash. He concluded that the total amount of unpaid federal taxes from 1997 to the first quarter of 2001 was $9,982,690.51. An insurance fraud investigator, Neil Johnson, also testified as a summary witness about employers' obligations to maintain workers' compensation insurance and how insurers calculate premiums based, in part, on reported payroll. He concluded that the total loss in insurance premiums to the workers' compensation companies was $6,457,500.

The Government also called Dich Trieu, Xieu Van Son and Charles Wallace to testify about their involvement with the defendants, DAK, Pro Temp and Precission. Trieu and Van Son explained that Daniel asked them to lend their names and sign documents setting up Pro Temp and Precission. Trieu and Van Son complied. They also recruited temporary workers for the companies, cashed company checks and helped distribute cash to the temporary workers. They testified that Aimee oversaw the companies' payroll record-keeping operations and wrote checks to move money between company accounts. She also wrote checks on company accounts to obtain cash for the cash payroll system. Van Son testified that he occasionally would deposit checks drawn on company accounts for large quantities of cash and give it to Aimee, but he generally handed the cash off to Charles Wallace. Wallace testified that the defendants employed him to do the accounting for DAK, Pro Temp and Precission. Wallace attended many of the business meetings with clients and insurance companies; he also prepared and filed the false tax forms with the IRS.

The defendants' theory of defense was that Trieu, Van Son and Wallace had duped them into joining the tax and insurance fraud scheme. They impugned the credibility of Trieu, Van Son and Wallace by exploring their prior criminal histories, untruthful statements under oath and, with respect to Van Son, his penchant for gambling.

A jury convicted the defendants on all counts. The district court calculated a total offense level of 31 for Daniel with a criminal history category of I. It calculated a total offense level of 28 and a criminal history category of I for Aimee. In calculating their offense levels for the tax counts, the court added the amount of unpaid state taxes to the amount of unpaid federal taxes, which caused each of the defendants to receive a base level that was one point higher than they would have received if only federal taxes had been included in the calculation. Daniel was sentenced to 108 months' imprisonment and Aimee was sentenced to 78 months' imprisonment.

## II. DISCUSSION

### A.

We first address whether the district court erred in declining to suppress evidence seized during the raid of the Bristol Drive office pursuant to a search warrant. We examine the affidavit submitted to the magistrate judge "'in a practical, commonsense fashion,'" and give "'considerable deference' to the issuing magistrate's conclusion that probable cause has been established." United States v. Woodbury, 511 F.3d 93, 98 (1st Cir. 2007) (quoting United States v. Feliz, 182 F.3d 82, 86 (1st Cir. 1999)).

**1.**

On June 25, 2001, a magistrate judge issued a search warrant allowing FBI and IRS agents to search the offices of DAK, Pro Temp and Precission at 14 Bristol Drive. This warrant was based on the affidavit of FBI Agent Nancy McCormick. In her affidavit, Agent McCormick described a fraudulent scheme involving the defendants. Her description was based, in part, on the testimony of Michael Powers, who had been a DAK bookkeeper three years earlier. Agent McCormick also described financial records obtained during the Government's investigation showing cash withdrawals by the three companies of nearly $40 million between 1997 and 2001, despite a 1994 injunction prohibiting Aimee from paying employees in cash.[3] Her affidavit also described surveillance video showing Daniel and Aimee operating a business out of the Bristol Drive office during April 2001.

Acting under the search warrant, federal agents seized payroll sign sheets, envelopes with cash, a weekly schedule for distribution of payroll and spreadsheet summaries of what the Government characterizes as false payroll information. Agents also

---

[3] On September 24, 1992, the Department of Labor filed a lawsuit against Aimee and the Daily Agency, a predecessor of DAK. See Trial Tr. vol. 8, 93-96, Feb. 6, 2008. The parties settled that lawsuit in August 1994 and the Department of Labor thereby enjoined Aimee and the Daily Agency from paying any employees in cash. Instead, they were to "make all payment by check or other paper." See Trial Tr. vol. 4, 132-35, Jan. 30, 2008.

seized more than 500 floppy disks, some of which contained payroll-related documents.

**2.**

The defendants submit that issuance of the warrant was based primarily on stale evidence provided by Michael Powers who had been employed as DAK's bookkeeper from June 1996 to May 1998. They maintain that other information in the search warrant affidavit failed to bridge the three-year gap between the end of Powers's employment and the date when the search warrant was issued. The defendants further contend that the information Powers provided concerning the defendants' conduct at a former office location was insufficient to establish that criminal activity was occurring at the new address, 14 Bristol Drive.[4] Cf. Emery v. Holmes, 824 F.2d 143, 149 (1st Cir. 1987) (holding that information on the new location of a car was not sufficient to refresh stale information regarding the car). They also contend that cash withdrawals are common in business operations, do not evidence criminal activity and therefore are not relevant or probative in establishing probable cause for a search. The defendants further submit that the good-faith exception does not apply, because the evidence was so stale that no law enforcement officer reasonably could have relied upon it.

---

[4] DAK, Pro Temp and Precission had moved into the 14 Bristol Drive office in December 2000.

-8-

The Government submits that the affidavit contained sufficient information to permit the magistrate judge to infer that evidence of a scheme to defraud would be found at 14 Bristol Drive in July 2001.  It maintains that the passage of three years from when Powers was employed with DAK to when a search warrant was obtained did not render the information stale because Powers described an ongoing scheme during his employment at DAK that illustrated a pattern of continuing fraudulent activity unlikely to terminate on its own.  It notes that a 2001 surveillance video evidenced that the defendants were operating their business at 14 Bristol Drive and contends that a search of the premises was likely to turn up business records, which "'defy claims of staleness.'" Appellee's Br. 27 (quoting United States v. Abboud, 438 F.3d 554, 574 (6th Cir. 2006)).  The Government contends that the withdrawal of $40 million between 1997 and 2001 was suspicious, given the outstanding injunction prohibiting cash payments to employees. Finally, the Government concludes that, even if the warrant was based on impermissibly stale information, the agents relied on the warrant in objective good faith because they took various steps to corroborate and update Powers's information.

**3.**

In United States v. Schaefer, 87 F.3d 562 (1st Cir. 1996), we articulated the governing principle that must guide

judicial decision making when some of the information tendered in support of a search warrant is remote in time:

> When an affidavit tendered in support of a warrant application contains information that is remote in time, a magistrate may still hold it to be adequate if it also contains sufficient recent facts corroborating the older data and linking that data to the present.

Id. at 568. Here, the defendants submit that the new information, alone, does not establish probable cause that criminal activity was taking place. However, the magistrate judge must make a determination based on the totality of the circumstances. See Illinois v. Gates, 462 U.S. 213, 238 (1983) ("[W]e reaffirm the totality-of-the-circumstances analysis that traditionally has informed probable cause determinations."). Powers's interviews established that the defendants had engaged in fraud for several years by paying employees in cash to avoid making full workers' compensation and IRS payments. Evidence of large cash withdrawals and surveillance video showing the continued operation of a business adequately refreshed Powers's information. Consequently, the magistrate judge did not exceed the bounds of his discretion in concluding that the evidence, when assessed in its totality, constituted probable cause to believe that evidence of illegal activity would be found at the address.[5] The methodology followed

---

[5] See 2 Wayne R. LaFave, Search and Seizure § 3.7(a) (4th ed. 2004) ("Because the probable cause determination is to be based upon all the relevant facts and circumstances, [] more recent

in assessing the tendered information conformed to the standards set forth by the Supreme Court in Gates, and the evidence was sufficient to support a finding of probable cause. The district court's denial of the motion to suppress was correct.

**B.**

We next review whether the prosecutor's remarks regarding a trial exhibit constituted reversible error.

In the absence of a contemporaneous objection, we review a claim of prosecutorial misconduct for plain error; we shall reverse only if the defendants can demonstrate that there was error, that the error was obvious and that the error affected the defendants' substantial rights by altering the outcome of the trial. United States v. Shoup, 476 F.3d 38, 42 (1st Cir. 2007).

**1.**

At trial, government witnesses testified about a disk labeled "Pro Temp Q Data" ("Exhibit 375") that had been found on Aimee's computer desk. IRS Special Agent James Donahue testified that the disk had "either QuickBooks or Quicken data" on it. Trial Tr. vol. 6, 62, Feb. 1, 2008. When the prosecutor asked what that was, Agent Donahue responded that "Quicken is generally sort of

---

events may take on greater significance when considered together with other facts which are not as current but which were much more incriminating at the time they occurred."); see also Stephen A. Saltzburg & Daniel J. Capra, American Criminal Procedure 126 (8th ed. 2007) (noting that stale information may be refreshed by corroborating, recent information).

like an electronic checkbook." Trial Tr. vol. 6, 63, Feb. 1, 2008. Charles Wallace, who handled bookkeeping and accounting for the defendants, testified that he recognized the disk and stated that it "would have been [a] backup disk for the checkbook for Pro Temp." Trial Tr. vol. 9, 67, Feb. 7, 2008. During closing argument, the prosecutor asserted that Aimee was involved with directing and monitoring the Pro Temp and Precision cash payroll scheme, stating: "This disk has Pro Temp's checkbook on it. Mrs. McElroy had Pro Temp's checkbook sitting on her computer desk when it was searched by the FBI and the IRS." Trial Tr. vol. 12, 17, Feb. 12, 2008. The prosecutor later told the jury that the disk "is a smoking gun" and reiterated that it "is [a] checkbook for Pro Temp." Trial Tr. vol. 12, 95, Feb. 12, 2008.

## 2.

The defendants submit that the Government mischaracterized the contents of Exhibit 375 and that this mischaracterization affected the outcome of the trial because the jury did not have access to the actual contents of the disk. They note that the transactions on the disk all occurred in 1995, and therefore could not have been a checkbook for an ongoing business. The defendants maintain that a new trial is warranted.

The Government submits that testimony that Quicken was akin to an "electronic checkbook" and Wallace's statement that the disk was a backup copy of Pro Temp's checkbook adequately supported

-12-

the prosecutor's remarks. The Government observes that it made no representation with regard to the age of the data and maintains that the disk likely had been used recently because the disk was found in June 2001, after the companies had moved offices.

The Government further submits that, even if the exhibit was mischaracterized, the misrepresentation had no effect on Daniel because its probative value was to show Aimee's involvement in Pro Temp operations. It maintains that a new trial is not warranted for Aimee because the Government did not misrepresent deliberately the disk, because defense counsel argued to the jury that the disk was an old backup that might have been waiting for reuse and because the Government did not have the opportunity to give a curative statement because of the defendants' failure to object. Finally, the Government notes that there was other evidence tying Aimee to the fraudulent scheme.

There was no plain error. Most importantly, the Government's statements that the disk was the Pro Temp checkbook were not misleading in light of the earlier Government testimony. The prosecutor's remark was fair comment. Moreover, the defendants had the opportunity to challenge the Government's interpretation of the disk's role in the business. Although the defendants argue that the contents of the disk undermine the Government's attempt to construe it as a checkbook, they do not appear to have sought to have the contents of the disk admitted into evidence.

-13-

Even if the statement had been inappropriate, we certainly cannot say that this reference by the prosecutor "poisoned the well." See United States v. Robinson, 473 F.3d 387, 398 (1st Cir. 2007). "We weigh several factors in determining whether prosecutorial misconduct has so poisoned the well that a new trial is required: (1) the severity of the misconduct; (2) the context in which it occurred; (3) whether the judge gave any curative instructions and the likely effect of such instructions; and (4) the strength of the evidence against the defendant." Id. (internal quotation marks omitted). The misconduct in this case was not severe; indeed, it was not misconduct. There was sufficient evidence against the defendants for the jury to return a guilty verdict. The defendants' involvement in the fraudulent scheme was established by the testimony of the former DAK, Pro Temp and Precission employees. For example, the former employees who worked in the office with Aimee testified that she managed the office and supervised the operation of the computerized and floppy-disk payroll systems. Aimee wrote checks transferring money between the companies and witnesses testified that she handled large quantities of cash in the office. Daniel was heavily involved in distributing the cash and working with Wallace to hide the cash payroll component from the IRS and insurers. The Government also introduced testimony from one of the insurance agents that Aimee attended a meeting concerning one of the workers'

compensation insurance policy audits.   Put in context, the prosecutor's statements concerning the disk do not amount to plain error.

## C.

We now turn to whether the district court committed reversible error by admitting into evidence summary testimony and charts.   The defendants objected to admission of the evidence and we review the district court's decision to admit evidence for an abuse of discretion.   United States v. Stierhoff, 549 F.3d 19, 27 (1st Cir. 2008).

## 1.

Several individuals testified at trial about the amount of money that the defendants allegedly had failed to pay the IRS. IRS Special Agent Joseph Guidoboni testified as a summary witness. He related that he had computed the unreported payroll for the three companies and had concluded that the total amount of unpaid federal taxes was $9,982,690.51.   His calculations were based on witness testimony, at least 1000 documents (including tax returns) and records of the defendants' check payroll system.

Neil Johnson, an insurance fraud investigator, also testified as a summary witness.   He stated that he had calculated insurance losses based on a review of the companies' workers' compensation insurance applications and related documents, tax returns filed with the IRS, tax returns provided to auditors and

worksheets prepared by the insurers. He prepared summary charts estimating the total loss in insurance premiums to be $6,457,500. These charts were admitted into evidence over the defendants' objections.

**2.**

The defendants submit that the testimony of Agent Guidoboni and Mr. Johnson, as well as their exhibits, were not admissible under Federal Rule of Evidence 1006 because the rule only allows the introduction of summary evidence that summarizes documents, as opposed to evidence that summarizes testimony.[6] While not contesting the admissibility of the evidence under Rule 611(a) and Rules 702 and 703, they claim that the evidence should not have been admitted under Rule 403 because Agent Guidoboni and Mr. Johnson relied on the testimony of Wallace, whose credibility, they contend, was hotly contested at trial. In the defendants' view, the district court erred by failing to instruct the jury that it had to weigh the credibility of the testimony that formed the basis of Agent Guidoboni's and Mr. Johnson's testimony. They contend that the error was unfairly prejudicial because it allowed

---

[6] Federal Rule of Evidence 1006 states,

> The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation. The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at reasonable time and place. The court may order that they be produced in court.

-16-

the Government to "bolster the credibility" of Wallace. Appellant's Br. 51.

The Government characterizes the testimony of Mr. Johnson and Agent Guidoboni and their charts as permissible pedagogical devices used to "'clarify and simplify complex testimony or other information'" and to help counsel present its argument to the jury. Appellee's Br. 46 (quoting <u>United States</u> v. <u>Milkiewicz</u>, 470 F.3d 390, 397 (1st Cir. 2006)). The Government contends that the evidence was admissible under Rule 611(a).[7] <u>See</u> <u>Milkiewicz</u>, 470 F.3d at 397. The Government also submits that Mr. Johnson's summary charts and testimony were permissible summaries of documents under Rule 1006. As to the testimony and charts introduced by Agent Guidoboni, the Government maintains that testimony of an IRS agent may be admissible under Rules 702 and 703, even if the district court does not qualify the agent as an expert.[8] <u>See</u> <u>United States</u> v. <u>Hatch</u>, 514 F.3d 145, 164 (1st Cir.

---

[7] Federal Rule of Evidence 611 states, in relevant part,

(a) Control by court. The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment.

[8] Federal Rule of Evidence 702 states,

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as

2008) (holding that the district court did not abuse its discretion in allowing an IRS agent to testify about tax issues despite not being admitted as an expert witness).

Addressing Rule 403, the Government submits that the evidence was not excludable because it was clear from Agent Guidoboni's testimony that he relied only partly on Wallace's testimony. It observes that both Agent Guidoboni and Mr. Johnson relied on numerous documents and that the district court acted within its discretion in admitting the testimony and exhibits. United States v. Kornegay, 410 F.3d 89, 96 (1st Cir. 2005) ("Trial judges enjoy wide latitude in making Rule 403 rulings and are only overturned after a showing of an egregious error.").

---

an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Federal Rule of Evidence 703 states,

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted. Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect.

**3.**

Our case law permits the use of summary tools to clarify complex testimony and evidence. Milkiewicz, 470 F.3d at 396-98. Although the defendants argue in their reply brief that this case can be distinguished from Milkiewicz because the summary evidence was admitted into evidence, that case does not rule out the possibility of such evidence being admitted. In Milkiewicz we said that "in most cases a Rule 1006 chart will be the only evidence the fact finder will examine concerning a voluminous set of documents." Id. at 396 (emphasis in original). In some instances, however, a Rule 1006 chart may itself be admitted into evidence or summary witness testimony may be permitted pursuant to Rule 611(a). Id. at 397-98; see also Stierhoff, 549 F.3d at 27-28. Rule 611(a) testimony and exhibits "typically are used as pedagogical devices to clarify and simplify complex testimony or other information and evidence or to assist counsel in the presentation of argument to the court or jury." Milkiewicz, 470 F.3d at 397 (internal quotation marks omitted). In some cases, "such pedagogical devices may be sufficiently accurate and reliable that they, too, are admissible in evidence, even though they do not meet the specific requirements of Rule 1006." Id. at 398.

With regard to summary witness testimony, we have urged caution, noting that such witnesses are allowed only in limited situations. United States v. Flores-de-Jesus, 569 F.3d 8, 18 (1st

-19-

Cir. 2009).  We noted:  "The reluctance of courts to allow the government an additional opportunity to present its case in a tidy package at the end of its presentation of evidence, even when the summary evidence is, by definition, completely consistent with the rest of the trial record, confirms that the imprimatur problem with such repetitive testimony is inescapable whether that testimony comes at the beginning or end of the government's case."  Id. at 19.   Nevertheless, we have found summary witnesses to be appropriate within the context of tax cases:  "We have recognized as a general proposition that testimony by an IRS agent that allows the witness to apply the basic assumptions and principles of tax accounting to particular facts is appropriate in a tax evasion case."  Stierhoff, 549 F.3d at 27-28.  We held that "in a tax evasion case, a summary witness may be permitted to summarize and analyze the facts of record as long as the witness does not directly address the ultimate question of whether the accused did in fact intend to evade federal income taxes."  Id. at 28.[9]

---

[9]  Our cases are generally consistent with other circuits' treatment of summary witness evidence offered in complex cases. See, e.g., United States v. Harms, 442 F.3d 367, 375-76 (5th Cir. 2006); United States v. Pree, 408 F.3d 855, 869-72 (7th Cir. 2005); United States v. Sabino, 274 F.3d 1053, 1067 (6th Cir. 2001), modified on other grounds, 307 F.3d 446 (6th Cir. 2002); United States v. Pinto, 850 F.2d 927, 935 (2d Cir. 1988); see also 4 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 611.02[2][a][vii] (2d ed. 2009); 6 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 1006.08[4] (2d ed. 2009).

Applying these principles to the situation before us, we conclude that the testimony of Agent Guidoboni and Mr. Johnson, as well as their exhibits, were properly admitted. Agent Guidoboni's testimony and exhibits fell within the permissible uses of Rules 1006 and 611(a) evidence we described in Milkiewicz and Stierhoff. His testimony did "no more than analyze facts already introduced into evidence and spell out the tax consequences that necessarily flow from those facts." Id.; see also United States v. DeSimone, 488 F.3d 561, 577 (1st Cir. 2007) ("The chart listed complicated transactions from many sources to summarize the government's calculations concerning taxable income, an essential part of the government's case."). Moreover, the same reasoning that would permit an IRS agent to give summary testimony in a tax evasion case applies to an insurance executive giving summary testimony about unpaid workers' compensation insurance premiums. Consequently, the summary testimony and exhibits of Mr. Johnson were proper as well.[10]

Finally, the summary evidence was not admitted in contravention of Rule 403. The testimony of agent Guidoboni and Mr. Johnson was probative of the defendants' knowledge of their tax and insurance obligations and their intent to commit fraud. The alleged prejudice to the defendants--that Agent Guidoboni relied on

---

[10] Although the evidence was admissible in this case, we again emphasize the need for caution when summary witness testimony and exhibits are offered and note that they are allowed only in limited situations. See United States v. Flores-de-Jesus, 569 F.3d 8, 18-19 (1st Cir. 2009).

the contested testimony of Charles Wallace--was minimal because the defendants had an opportunity to cross-examine both Agent Guidoboni and Wallace. Agent Guidoboni acknowledged that he did not verify independently how much of the unreported cash payroll had been paid to the temporary workers, but he also testified that he did verify that the payroll reported in the companies' IRS filings actually reflected the companies' computerized check payroll records. Thus, Agent Guidoboni's testimony did not merely bolster Wallace's testimony; it traced the documentary evidence until no paper trail existed and drew inferences about the unpaid taxes from that situation. Mr. Johnson testified that he relied primarily on the documentary evidence. The jury was free to credit or reject the testimony of Agent Guidoboni, Mr. Johnson and Wallace independently. The district court properly exercised its discretion in admitting the evidence and the defendants have not shown that an "egregious error" occurred. See United States v. Kornegay, 410 F.3d 89, 96 (1st Cir. 2005). Indeed, we believe that the district court acted well within its discretion.

### D.

We now address whether the district court committed reversible error by allowing the prosecutors to elicit out-of-court testimony identifying Aimee. We review the district court's admission of a statement after an objection for an abuse of discretion and shall vacate a jury verdict only if the improperly

admitted statement was not harmless.  <u>United States</u> v. <u>Upton</u>, 559 F.3d 3, 15 (1st Cir. 2009), <u>cert. denied</u>, 2009 WL 1983336 (2009).

**1.**

Lucia Raposo testified for the Government.  She worked at a fish processing plant staffed by employees of DAK, Pro Temp and Precission.  At trial, the Government asked her whether she had ever seen Aimee.  Raposo said that she had seen Aimee in a car with George Wallace[11] at the plant.  The Government asked how she knew that the person she saw was Aimee.  She replied that a woman named Kelly DeMello was with her when they saw the car, and DeMello had stated:  "That's Aimee King with George Wallace.  Don't worry.  We're going to fix it."  Trial Tr. vol. 2, 46, Jan. 28, 2008.  The defendants moved to strike, but the court denied their motion.

**2.**

The defendants submit that Raposo's testimony regarding DeMello's statement was inadmissible hearsay.  They maintain that it was not admissible under Federal Rule of Evidence 803 because it did not explain or describe an event nor was DeMello's identification made under the stress of a startling event or condition.[12]  <u>See</u> <u>United States</u> v. <u>Berrios</u>, 132 F.3d 834, 838 (1st

---

[11] George Wallace, Charlie Wallace's brother, was one of the DAK employees who helped distribute cash payroll.  He testified at the trial but not about this incident.

[12] Federal Rule of Evidence 803 states, in relevant part:

The following are not excluded by the hearsay rule, even

-23-

Cir. 1998). The defendants contend that the error was not harmless because Raposo's statement attributed Aimee's knowledge of and participation in cash payments to temporary workers at client sites. They maintain that, given the lack of other evidence against her besides Wallace's testimony, Aimee may not have been convicted had the evidence been excluded.

The Government maintains the statement was admissible under Rule 803(1). It notes that DeMello's statement explained an event: that Aimee was in the car with George Wallace. The Government further maintains that DeMello's statement was contemporaneous with the event because of her use of the present tense phrase, "[t]hat's Aimee." Appellee's Br. 55. It further submits that, even if the statement was improperly admitted, the statement did not implicate Aimee in the cash payroll scheme and that there was other evidence against Aimee, such as the business records recovered from 14 Bristol Drive, the testimony of Wallace and other testimony.

though the declarant is available as a witness:

(1) Present sense impression. A statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter.

(2) Excited utterance. A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition.

-24-

**3.**

In <u>Berrios</u>, 132 F.3d at 838, a witness testified regarding whether a person in the photograph was "Pablo." Her knowledge of Pablo was based on a previous occasion when her husband said, "this is Pablo." <u>Id</u>. We held that the statement was inadmissible:

> By echoing her husband's introduction of Pablo, Fortin's proposed testimony meets the prerequisites of hearsay. The introduction of Pablo is a statement not made by the declarant in testimony offered to prove the truth of the matter asserted. For [Fortin's] testimony to be tenable the statement made by her husband must have been true. Because we have no way of verifying that Mr. Fortin was sufficiently familiar with Pablo to identify him to Mrs. Fortin, her testimony about Pablo is classic hearsay and was properly excluded.

<u>Id</u>. This case might, at first glance, seem dispositive of the question before us. However, upon closer examination, it becomes apparent that it really does not address directly the situation presented to us today. Indeed, it does not deal directly with the exception to the hearsay rule that the Government urges is applicable in this case. Rather, it deals only with the antecedent question of whether the identification--"this is Pablo"--was hearsay. The district court in that case had excluded the testimony as hearsay, and we affirmed, reasoning that, although the wife certainly could testify that her husband had said those words, the truth of the identification was entirely dependent on <u>his</u> knowledge of the identity of the individual who had entered the

couple's car. There was no evidence of record as to the basis of the husband's knowledge of that person.

There can be little quarrel with the case's analysis, as far as it goes. The identification was hearsay. The husband's intent was to tell his wife that the person in the back of the car went by the name "Pablo." The truth of that assertion is not something to which the wife could testify from her own knowledge or experience; she could only testify as to the fact that the statement was made. The court's analysis ended at this point. There simply was no independent examination by the district court in Berrios as to whether an exception to the hearsay rule applied. The reason for that omission is not evident from the text of the appellate decision.

In the case before us today, by contrast, the parties agree that the statement here is hearsay. Ms. Raposo testified that Kelly DeMello pointed out a couple in a car outside the building where both Raposo and Kelly DeMello worked. DeMello said "That's Aimee King with George Wallace. Don't worry we are going to fix it." Trial Tr. vol. 2, 46, Jan. 28, 2008. The identification of Aimee by DeMello was not a matter within the knowledge or experience of Raposo; it was entirely dependent on the knowledge or experience of DeMello.

We turn, then, to whether this hearsay statement is subject to an exception to the hearsay rule. In the Government's

-26-

view, the identification is admissible, despite its hearsay status, under Rule 803(1) as a present sense impression. The Reporter's notes to this exception state that the underlying theory of this exception is that the substantial contemporaneity of the event and statement negates the possibility of deliberate or conscious misrepresentation by the declarant. "Moreover, if the witness is the declarant, he may be examined on the statement. If the witness is not the declarant, he may be examined as to the circumstances as an aid in evaluating the statement." Advisory Committee's Notes on Fed. Rule Evid. 803(1) (citing Edmund Morris Morgan, Basic Problems of Evidence 340-41 (1962)). In commenting on this exception, McCormick notes that, "[l]ike all hearsay exceptions and exclusions other than admissions, present sense impressions and excited utterances require that the declarant have first hand knowledge, which can sometimes be proved entirely by the statement." 2 K. Broun, McCormick on Evidence § 271, p.252 (6th ed. 2006). The same treatise also notes that the exception is limited to "describing or explaining" the event or condition perceived and that the statement must be made either while the event is taking place or immediately thereafter.

Notably, this exception does not include, explicitly, a requirement for corroboration. Id.; see also United States v. Ruiz, 249 F.3d 643, 647 (7th Cir. 2001). In McCormick's view, the lack of such a requirement is justified because the "underlying

rationale offers sufficient assurances of reliability." McCormick, supra, at p.254. In most settings, the "limitation of the exception in terms of time and subject matter . . . insure[s] that the witness who reports the making of the statement will have perceived the event or at least observed circumstances strongly suggesting it." Id. The declarant and the reporting witness are present at the event or condition and both experience, at least to some degree, the event or condition sought to be admitted into evidence. Therefore, the testimony of the witness describing the circumstances in which the hearsay utterance was made corroborate, to a significant degree, the trustworthiness of the statement.[13]

In the most frequently encountered applications of this exception, the requirements of the exception do provide, by virtue of their restrictive language, sufficient assurance of the accuracy of the declarant's statement and of the absence of fabrication: an event or condition occurs under circumstances which the declarant

---

[13] Indeed, another treatise suggests that the Advisory Committee notes to the present sense impression exception, in noting that the witness may be examined as to the circumstances surrounding the declarant's utterance, amounts to an implied recognition of a corroboration requirement. 4 Stephen A. Saltzburg, Michael M. Martin & Daniel J. Capra, Federal Rules of Evidence Manual § 803.02[2][b] (9th ed. 2009). The treatise suggests further that most federal courts have read the exception to require such corroboration. See id. at §§ 803.02[2][6], 803.03[1] (collecting cases). Notably, the treatise quickly adds, however, that this "requirement" does not imply that the witness must be able to testify as to the exact circumstances under which the declarant made the statement; such a rigid requirement would rob the exception of much of its practical effect by making the declarant's statement simply cumulative of the witness's utterance.

and the witness experience under the same or nearly the same conditions. The declarant makes a statement describing the event at or very near the time of the observation and that statement is heard by the witness. There is no question that the declarant has firsthand knowledge of the occurrence. See McCormick, supra, at p.252. We admit the statement because the circumstances under which it was given--immediately after an observation--diminish substantially the opportunity for fabrication. We are comforted as to the correctness of our decision because the witness also experienced, at least to some degree, the situation under which the statement was made.

Identifications certainly are not beyond the ambit of the present sense exception in all instances.[14] Nevertheless, it must be acknowledged that they place an additional demand on the underpinnings of that exception. Admission of a hearsay identification requires that we accept not only the trustworthiness of the declarant's observation, but also his ability to name the particular actors in the event or condition that he observed. The admitting court must take care to ensure that, in addition to

---

[14] Indeed, both federal and state courts have admitted identifications under this exception. See, e.g., United States v. Delaplane, 778 F.2d 570, 574 (10th Cir. 1985); United States v. Earley, 657 F.2d 195, 198 (8th Cir. 1981); Jones v. State, 780 N.E.2d 373, 376-77 (Ind. 2002); McDowell v. State, 807 So. 2d 413, 421 (Miss. 2001). We have no reason to address, of course, the question of prior identifications or non-identifications through lineup or photo array under the present sense impression exception. See United States v. Brewer, 36 F.3d 266 (2d Cir. 1994).

meeting the exception's explicit requirement that the statement be made as the declarant was perceiving the event or condition or immediately thereafter, it is evident that the declarant possessed the requisite information to make the asserted identification.

In light of this analysis, resolution of the present issue presents unique difficulties. The district court had to determine whether the record contained enough evidence to permit the conclusion that DeMello knew Aimee sufficiently to permit DeMello to make an accurate identification of Aimee. In short, the district court had to determine whether DeMello had sufficient firsthand knowledge of Aimee's physical appearance to permit her to make the identification in question. There is some evidence in the record from which such firsthand knowledge might be inferred. DeMello was the wife of Sea Fresh owner Rick DeMello. As part of her role at Sea Fresh, she received and distributed payroll from the defendants' companies. However, there is no evidence in the record that this working relationship required in-person meetings between DeMello and Aimee. We also note that the Government never asked Raposo whether the person in the courtroom, seated at the defendants' table, was the person who had been identified by DeMello. Under these circumstances, and because we may decide the issue on the alternate ground of harmless error, we believe it prudent to pretermit any definitive ruling on this issue.

Even if the district court had abused its discretion in admitting the statement, the error would have been harmless. The jury had Wallace's testimony as well as the business records recovered from 14 Bristol Drive. The jury also heard the testimony of Van Son, Pro Temp's recruiter and payroll manager, who later became its president. We acknowledge that both of these individuals had pleaded guilty to offenses related to this case and appear to have testified for the Government as part of their plea agreements. Nevertheless, other unbiased witnesses implicated Aimee in the conspiracy. For example, former employees testified about Aimee's management of the cash payroll record-keeping system and how Aimee was primarily responsible for transferring money between the companies. Marta Rodriguez, a former employee, testified that she saw Aimee handle a large quantity of cash for payroll purposes in the office. Given the minor role that Raposo's testimony played in the trial and the fact that it was up to the jury to credit the other incriminating evidence and weigh the credibility of Van Son and Wallace, the admission of Raposo's statement was harmless.

**E.**

We now turn to the sentencing hearing and examine whether the district court erred by including unpaid state taxes in the total tax loss amount used to calculate the base offense level for sentencing the defendants.

"We review a district court's answers to abstract legal questions, including its interpretation of the federal sentencing guidelines, de novo." United States v. Jordan, 549 F.3d 57, 60 (1st Cir. 2008). Whether the district court erred by including state tax amounts from the defendants' relevant conduct is a question involving the application of law to fact, which we review on a sliding scale. See United States v. Sicher, 576 F.3d 64, 70 & n.6 (1st Cir. 2009) ("While we have used the language of 'de novo' review to apply to a trial judge's legal conclusion from the facts, we think this is more like a mixed question of law and fact, with a sliding scale of review depending on whether the trial judge's conclusion is more law-oriented or more fact-driven."). Because this question involves both questions of law and fact, the sliding scale standard of review is particularly appropriate in this case. We shall apply closer scrutiny to the legal component of the sentencing and review the district court's factual findings with greater deference.

**1.**

The defendants submit that a "relevant conduct" analysis should not apply in the court's calculation of their base offense levels because U.S.S.G. §§ 2T1.1 and 2T1.4 provide explicit instructions regarding the calculation for "tax loss" attributable to federal tax offenders. They maintain that this language trumps § 1B1.3's broad rule of construction for relevant conduct and that tax loss should therefore be based solely on federal tax loss. The defendants observe that the Guidelines provide no formula for calculating state tax loss and that the district court's interpretation of the Guidelines would lead to sentencing disparities based on which states impose state income tax.

The Government notes that Application Note 2 to § 2T1.1 states: "In determining the total tax loss attributable to the offense (see § 1B1.3(a)(2)), all conduct violating the tax laws should be considered as part of the same course of conduct or common scheme or plan unless the evidence demonstrates that the conduct is clearly unrelated."[15] The Government maintains that the district court did not err by treating the defendants' failure to pay state taxes as relevant conduct to be included in the total tax loss. The Government points out that the evasion of state taxes mirrored the fraudulent federal tax scheme and that both involved

---

[15]  The Government cites to the 2000 Guidelines. Other than additions to the application notes in the 2007 Guidelines, not relevant here, the 2000 and 2007 Guidelines are identical.

a common purpose and were nearly identical in execution and regularity.

## 2.

We see no reason why state tax evasion, when proven to be sufficiently similar to the convicted crime, should not be included in the § 2T1.1 calculation of "tax loss." At the outset, we note that the four circuits that have considered this issue have held that state tax offenses may be included with state tax evasion in the total loss calculation.[16] The Fourth, Fifth and Sixth circuits, in particular, interpret U.S.S.G. § 1B1.3(a)(2) as allowing state tax evasion totals to be included with federal tax evasion amounts where there was a "common scheme or plan" and the same "course of conduct" for the state and federal offenses. United States v. Maken, 510 F.3d 654, 659 (6th Cir. 2007); United States v. Baucom, 486 F.3d 822, 829 (4th Cir. 2007), vacated on other grounds, Davis v. United States, 128 S. Ct. 870 (2008); United States v. Powell,

---

[16] See United States v. Maken, 510 F.3d 654, 659 (6th Cir. 2007) (holding that the district court did not err in determining that state tax losses constituted "relevant conduct"); United States v. Baucom, 486 F.3d 822, 829 (4th Cir. 2007) (holding that the district court erred in failing to include state tax amounts in the calculation of relevant conduct), vacated on other grounds, Davis v. United States, 128 S. Ct. 870 (2008); United States v. Fitzgerald, 232 F.3d 315, 318, 321 (2d Cir. 2000) (affirming inclusion of state and city tax amounts in a total loss calculation); United States v. Powell, 124 F.3d 655, 665-66 (5th Cir. 1997) (holding that the district court properly included evaded state taxes as "relevant conduct" in calculating the total tax loss).

124 F.3d 655, 664-65 (5th Cir. 1997); see also U.S.S.G. § 1B1.3(a)(2).

The plain language of Application Note 2 requires that a sentencing court factor relevant conduct into a total tax loss calculation. Thus, contrary to the defendants' suggestion, no ambiguity exists as to whether relevant conduct is to be considered in calculating § 2T1.1 tax losses.

In determining whether state tax evasion constitutes relevant conduct, we look to the commentary to § 1B1.3. Section 1B1.3 provides specific factors to be considered in determining whether certain conduct was part of a "common scheme or plan" or the "same course of conduct." "For two or more offenses to constitute part of a common scheme or plan, they must be substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar modus operandi." See U.S.S.G. § 1B1.3 cmt. n.9. "Factors that are appropriate to the determination of whether offenses are sufficiently connected or related to each other to be considered as part of the same course of conduct include the degree of similarity of the offenses, the regularity (repetitions) of the offenses, and the time interval between the offenses." Id.

The Government has established that the defendants' evasion of state taxes was part of the same "course of conduct" or "common scheme or plan" as their evasion of federal taxes. The

sentencing record demonstrates that the defendants did not comply with Massachusetts state tax law--particularly relevant criminal conduct in this case. <u>See</u> Mass. Gen. Laws ch. 62C, § 73(a). There is no question that the defendants' victims were similar (federal and state governments), the defendants committed both crimes with the same accomplices (Wallace, Van Son and Trieu), had a common purpose (tax evasion), and evinced similar <u>modus</u> <u>operandi</u> (fronting a legitimate business and falsifying filings). Additionally, the events occurred simultaneously, further supporting the conclusion that the state tax evasion qualifies as relevant conduct. Thus, the district court correctly considered the state tax evasion to be relevant conduct in this case.

The district court correctly included the state tax loss within its relevant conduct loss calculation.

## III. CONCLUSION

For the foregoing reasons, we affirm the judgment of the district court.

**<u>AFFIRMED.</u>**